IN THE SUPREME COURT OF THE STATE OF DELAWARE

IN RE PETITION OF MARLA     §
MATRICE MURPHY             §    No. 398, 2021
                             §

Submitted: June 29, 2022
Decided:   August 17, 2022

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.

On appeal from the decision of the Board of Bar Examiners of the State of Delaware: **REMANDED**.

Anthony N. Delcollo, Esquire (*argued*), Christopher J. Isaac, Esquire, OFFIT KURMAN, P.A., Wilmington, Delaware, *for Petitioner Marla Matrice Murphy*.

Andrew D. Cordo, Esquire, WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware, *for the Board of Bar Examiners*.

***PER CURIAM*:**

At the height of the COVID-19 pandemic in 2020, the Delaware Supreme Court cancelled the Delaware Bar Exam. In 2021, with the pandemic still causing unprecedented illness and death, the Board of Bar Examiners administered the Bar Exam but required all applicants to take it remotely using the ExamSoft software program.

The 2021 Bar Exam was the first time the Delaware Board, and many boards across the country, administered a bar exam remotely. There were teething pains. Some applicants experienced screen freezes. Others had crashes requiring restarts. After reviewing the technical problems and consulting a grading expert, the Board increased the scores for applicants who had to restart their computers.

Marla Murphy sat for the 2021 Bar Exam and received an increase in her score for technical difficulties but did not pass. She petitioned the Board for a hearing and argued that the Board's grade adjustments in response to software difficulties were arbitrary and capricious, and the Board did not adequately execute her approved testing accommodations. Murphy asked the Board to bypass the Board's and this Court's admission requirements and grant her admission to the Delaware Bar.

The Board denied Murphy's petition for a hearing. The Board reasoned that, under its rules, it must treat all scores as final once released and all applicants must attain a certain score to qualify for admission to the Delaware Bar. Because Murphy was challenging her test scores and requested admission to the Bar as her only remedy, the Board found that it could not grant the relief she sought.

2

On appeal, Murphy claims that the Board employed an arbitrary score adjustment procedure to address technical issues during the Exam. She also contends that her specific technical difficulties with the Exam software, the lack of a paper copy of the Exam, and alleged distracting behavior by her in-person proctor resulted in an effective denial of the testing accommodations approved by the Board. As she did before the Board, Murphy requests admission to the Delaware Bar, even though she did not achieve a passing score on the 2021 Bar Exam.

The Board has done its best to navigate the Delaware Bar Exam through the COVID-19 pandemic. We sympathize with the difficulties Murphy and all applicants experienced with the 2021 Bar Exam. But we conclude that the score increases for certain applicants, including Murphy, were not arbitrary or manifestly unfair and met constitutional requirements. We also find that neither the Board nor the Court can waive its admission requirements and admit Murphy to the Delaware Bar.

Finally, for Murphy's Americans with Disabilities Act claim, the Board did not conduct a hearing to determine whether Murphy was denied the accommodations approved by the Board during administration of the Exam. Even though waiver of admission requirements is not a remedy available to Murphy for ADA violations, if Murphy intends to pursue some other remedy for those claims following appeal, the Board should conduct a hearing and determine whether Murphy's approved accommodations were not provided during administration of the Exam. The

determination of the appropriateness of any remedy should occur only following the development of the factual record in the event the Board determines that the ADA accommodations were not provided and executed as approved.

I.

The 2021 Bar Exam took place over three days, from July 26–28, 2021. It had three parts—the Delaware essay section, the Multistate Performance Test ("MPT"), and the Multistate Bar Exam ("MBE").[1] The latter two sections were developed by the National Conference of Bar Examiners ("NCBE"). Due to the ongoing COVID-19 pandemic, the 2021 Bar Exam was administered remotely, a development that was announced months before the Exam date.[2] All applicants took each of the three parts online using ExamSoft's secure remote testing software.[3] Because of the Bar Exam's remote format, all 2021 applicants were advised to fill out a report (an "Incident Report") if they experienced any testing irregularities. The

---

[1] Rules of the Board of Bar Examiners of the State of Delaware, Rule 12 (hereinafter, "Board Rule" or "BR"). *See also In re Hudson*, 402 A.2d 369, 370 (Del. 1979) (stating the MBE "is administered on a national basis by the National Conference of Bar Examiners. All applicants in all States which use the MBE take the same test at about the same time.").

[2] App. to Answering Br. at B1 (BBE Email Mar. 15, 2021). The Board stated the following regarding the COVID-19 pandemic and the safety of administrating an in-person exam:

> The Board has continued to monitor closely the most recent information from health authorities, including projections regarding the pandemic and the ongoing need for restrictions on in-person gatherings. The Supreme Court and the Board believe that remote administration of the 2021 bar examination is the best approach to mitigating the continued risks associated with large gatherings during the pandemic. The remote format provides all applicants wanting to sit for the Delaware exam the opportunity to do so safely. The Board is confident that the administrative protocols currently in place will allow for a secure and effective administration of the exam in July.

*Id.*

[3] *Id*. (BBE Email Mar. 15, 2021).

4

Board provided blank Incident Report forms for applicants to fill out and upload to their online Bar application.[4] The Board also provided examples of testing irregularities, such as an applicant moving away from their laptop camera, or "technical problems" with the testing software.[5]

Murphy applied to sit for the Delaware Bar Exam for the first time in 2021. She submitted an Application for Testing Accommodations (the "Accommodations Application") under Board Rule 15.[6] She also provided documentation to show that she has several disabilities that affected her ability to take the Bar Exam.[7] Murphy requested 100% extra time for the entire exam, along with "pencils, highlighter, scratch paper, the ability to read the questions out loud, stop the clock breaks and a private room."[8] She did not request a paper copy of the Bar Exam.

The Board approved Murphy's Accommodations Application as follows: "100% extension of time (without 'stop the clock' breaks), a private room, [] permission to have scratch paper and a pencil . . . and to read aloud."[9] Of the accommodations requested, only her request for "stop the clock" breaks was denied,

---

[4] Opening Br. Ex. D.
[5] *Id.* The form provided other examples of testing irregularities that would necessitate an applicant to file a report such as "any disruption, including (but not limited to) requiring a "resume code." *Id.* The form also stated that "[a]ll incident reports are due by 11:00 p.m. on the day that the incident occurs." *Id.*
[6] Opening Br. Ex. A.
[7] *Id.* at 1.
[8] *Id.* at 2.
[9] Opening Br. Ex. B.

and her request to use highlighters was not addressed.[10]  Although the Board allowed Murphy to use physical scratch paper during her exam, the Board's letter did not specify for what portions of the Bar Exam Murphy would be allowed to use scratch paper.  The Board stated that her "proctor will collect the scratch paper at the *end of each session* of the exam."[11]  To accommodate the requests for additional time and the use of physical scratch paper, the Board scheduled her exam for Monday, July 26, through Friday, July 30, to take place at a testing site in Wilmington, Delaware.[12]

On July 26, 2021, Murphy went to the location of her private room to take the Bar Exam.  According to her petition and appeal, she had problems during her exam which effectively deprived her of some of the testing accommodations approved by the Board.[13]  First, Murphy contends that her proctor "typed loudly on his keyboard, cracked his knuckles, and his cell phone rang" throughout her exam.[14]  Second, Murphy claims she suffered three separate ExamSoft failures that required her to restart her computer and later file three separate Incident Reports documenting the irregularities.  According to Murphy, these incidents increased the anxiety and stress she experienced during the test because of her disabilities and caused her to lose

---

[10] As we understand it, a "stop the clock" break essentially allows the applicant to pause the exam—in other words, stop working on the exam without affecting the time allowed to take the entire test.

[11] Opening Br. Ex. B (emphasis added).

[12] *Id.*

[13] The Board vigorously disputes Murphy's account of the testing accommodations.  Opening Br. Ex. F, at 2; Answering Br. at 12 n.38.

[14] Opening Br. at 8.

more time relative to her peers who experienced similar technical issues. Third, she contends that because she was not allowed physical scratch paper throughout the entirety of the Bar Exam, that accommodation was not fully provided. Finally, she argues that she was "denied a paper copy of the [Bar Exam],"[15] even though she concedes that she "did not specifically request a paper copy of the [Bar Exam] as [she] assumed one would automatically be provided."[16]

After administering the Bar Exam, the Board was advised that many applicants experienced difficulties with the ExamSoft software.[17] The software failures were not unique to Delaware test takers—they affected ExamSoft test takers nationwide.[18] Because of the software problems, the Board announced that it delayed the release of 2021 Bar Exam scores so that it could, with the help of a psychometrician, review the scores and provide scoring adjustments to mitigate the impact of the ExamSoft software problems.[19]

With respect to the essays and the MPT questions, the Board applied a "pro rata adjustment" that "allowed for an upward adjustment to an applicant's affected essay score based on the difficulty level of the affected essay and his/her average performance on the written questions in which the applicant had no technical

---

[15] *Id.* at 8.
[16] Opening Br. Ex. C, at 4.
[17] Opening Br. Ex. E, at 1.
[18] *Id.*; Opening Br. at 10–11.
[19] *Id.* at 1.

issues."[20]  This specialized adjustment could not be applied to the MBE section of the Bar Exam because, as the Board stated, "[i]ndividualized score adjustments were not feasible on the [MBE]."[21]  Instead, after consulting with its psychometrician, the Board "made an upward adjustment to the score of all applicants who experienced technical issues during the MBE.  This upward adjustment was equivalent to the difference between the mean MBE score of the affected applicant population and the mean MBE score of the unaffected applicant population."[22]

Applicants received a score adjustment based on an objective factor—a computer restart.  The ExamSoft software logged all restarts, creating a record of which applicants experienced technical difficulties.  No other technical difficulties were given scoring adjustments.  Importantly, "[n]one of the scoring adjustments to the 2021 exam adversely affected any applicant, regardless of whether he/she experienced any technical issues" and "[n]o applicant's score was reduced as a result of applying the adjustments to the scoring methodology."[23]  Murphy received a score increase for the technical problems she experienced during the Bar Exam.[24]

---

[20] *Id.*
[21] *Id.* at 2.
[22] *Id.*
[23] *Id.*
[24] *See* App. to Answering Br. at B4–5.

The Board released the Bar Exam results in October of 2021. Murphy was notified that she did not pass.[25] Because she did not pass, she received her score report, that explained how her final score was calculated.[26]

Murphy petitioned the Board for a hearing (the "Petition"). She asserted that the "Board acted in an arbitrary and unfair manner in connection with the administration of the July 2021 Delaware Bar Exam that led to [Murphy's] failing score" for three reasons: the Board's modification of scores was arbitrary and unfair; her accommodations were not provided in accordance with Title II of the ADA; and the accommodations that were granted were not adequately provided as required by Titles II and III of the ADA and the Due Process Clause of the United States Constitution.[27] The Petition requested that the Board certify her as qualified for admission to the Bar under Supreme Court Rule 52(d), despite not meeting the Board's and the Court's admission requirement of a passing score on the Bar Exam.[28]

---

[25] The minimum passing score is 145. *Id.* at B4 (Information Regarding Score Reports for 2021 Delaware Bar Exam). Murphy received a total scaled score of 139.60. *Id.* at B5 (Murphy's 2021 Delaware Bar Exam Score Report).

[26] *See id.* at B4 (Information Regarding Score Reports for 2021 Delaware Bar Exam), B5 (Murphy's 2021 Delaware Bar Exam Score Report).

[27] Opening Br. Ex. C, at 1, 3.

[28] Supr. Ct. Rule 52(d) in full provides that "[u]pon approval of the qualifications of any applicant for admission to the Bar, the Board shall execute and deliver to the applicant a certificate of the applicant's qualifications for admission to the bar."

The Board denied the Petition, stating that "applicants are not entitled 'to a hearing to challenge their test scores.'"[29] Further, the Board noted that it did not have "the authority to certify for admission an applicant who did not achieve a passing score on the Bar Exam" and that "the Board would be unable to grant the relief [Murphy] seek[s] even if [Murphy] could prove the facts alleged in the Petition, which the Board does not concede."[30]

Murphy has appealed the Board's decision to this Court and raises essentially the same issues raised below: the Board acted arbitrarily and with manifest unfairness in its score adjustment for technical issues with the ExamSoft software; the Board failed to provide her all the approved testing accommodations; and the Board deprived her of due process by not holding an evidentiary hearing regarding her allegedly deficient accommodations and request for a further scoring adjustment.

## II.

The Delaware Bar Exam "tests for minimum competence to practice law [in Delaware]."[31] The Board of Bar Examiners is an arm of this Court appointed under Rule 51 to administer the Bar Exam by establishing rules and testing procedures.[32]

---

[29] Opening Br. Ex. F, at 2 (citing *Applicant No. 26 to 2000 Del. Bar Examination v. Bd. Of Bar Exam'rs of the Del. Supr. Ct.*, 780 A.2d 252, 254 (Del. 2001)).
[30] *Id.* at 2. The Board did offer Applicant the opportunity to sit for the 2022 Bar Exam without paying the requisite fee. *Id.*
[31] *In re Hudson*, 402 A.2d 369, 371 (Del. 1979).
[32] *In re Huntley*, 424 A.2d 8, 10 (Del. 1980); *In re Hudson*, 402 A.2d at 371. *See Hawkins v. Moss*, 503 F.2d 1171, 1175 (4th Cir. 1974), *cert. denied,* 420 U.S. 928 (1975) ("The power of the courts of each state to establish their own rules of qualification for the practice of law within their

10

"The primary function of the Board of Bar Examiners is to measure professional competence; the purpose of the Bar Examination is to distinguish those applicants who appear to have the minimal competence for the practice of law."[33] "Admission to the [Delaware] Bar is not under any circumstances an automatic right."[34]

A person aggrieved by a final action of the Board may appeal to this Court for relief "if such action affects the substantial rights of the person claimed to be aggrieved, except that decisions of the Board with respect to a specific grade or grades assigned to any individual applicant are final and shall not be subject to review by the Court."[35] We have stated that "an applicant who may sit for the Bar Examination again has not suffered a deprivation of 'substantial rights.'"[36]

Under Supreme Court Rule 52(e), which governs appeals from the Delaware Board of Bar Examiners, such appeals are "argued and determined from the record of the matter before the Board of Bar Examiners and not by means of a hearing de novo."[37] Further, "[i]n exercising appellate review of actions of the Board of Bar Examiners, this Court performs a limited role."[38] "Unless it is demonstrated that the

---

jurisdiction, subject only to the requirements of the due process or equal protection clauses of the Fourteenth Amendment, is beyond controversy; in fact, it is a power in the exercise of which the state has 'a substantial interest.'").

[33] *In re Reardon*, 378 A.2d 614, 617 (Del. 1977).

[34] *In re McCaffrey*, 545 A.2d 617, 618 (Del. 1988) (alteration in original) ( quoting *In re Green*, 464 A.2d 881, 885 (Del. 1983)).

[35] Del. Supr. Ct. R. 52(e).

[36] *Applicant No. 26*, 780 A.2d at 253–54.

[37] Supr. Ct. R. 52(e).

[38] *Petition of Applicant No. 5 to 1994 Del. Bar and Prof'l Conduct Examinations*, 658 A.2d 609, 611 (Del. 1995).

Board has discharged its responsibility in an arbitrary, fraudulent or unfair manner, this Court will not interfere with the Board's determination of competence."[39]  And when reviewing Bar Exam procedures for constitutional violations, "this Court's inquiry is whether the Board's procedures are rationally related to the testing purpose."[40]

## A.

First, Murphy contends the Board's scoring adjustment procedure addressing ExamSoft software issues was arbitrary and manifestly unfair.  According to Murphy, she experienced technical issues during Bar Exam sections where she was most prepared and anticipated doing well.  Because the Board's scoring adjustment procedure did not account for an applicant's subjective view of the difficulty of each question, Murphy claims it was arbitrary and manifestly unfair.  She also argues that she was disproportionately affected by the technical issues because of her disabilities and suggests that "[t]here were better alternatives available then [sic] allowing for the upward adjustment of random essay answers."[41]

We note at the outset that "generally, in any test, there obviously must be a passing line."[42]  "With the benefit of hindsight, reasonable minds may differ, perhaps, as to some other solution consistent with the Board's primary function

---

[39] *Id.* (citing *In re Fischer*, 425 A.2d 601 (Del. 1981)).
[40] *Id.*
[41] Opening Br. at 30.
[42] *In re Fischer*, 425 A.2d at 602.

which may have resulted in a greater degree of fairness."[43]  But, "[t]ests, like taxes, can never be perfect and completely fair to all."[44]  In *In re Reardon*, we addressed the propriety of the Board's change to the scoring procedures after administration of the 1976 Bar Exam.[45]  After grading, the Board noticed that the pattern of grades for Essay No. 8 was extraordinarily low compared to other essays.[46]  Confronted with this data, "the Board concluded that Question No. 8 was not functioning to indicate reliably those applicants with minimum legal competence."[47]  To rectify the disparity, the Board excluded the grades from Essay No. 8 when calculating applicants scores on the essay section of the Bar Exam unless the change lowered an applicant's average essay score.  The Board's scoring modification allowed some applicants to pass the 1976 Bar Exam that otherwise would have failed.

Applicants who did not have their scores from Essay No. 8 excluded and failed the Exam sued, alleging that the Board's decision to modify the essay scores was arbitrary, unfair, and violated their due process and equal protection rights.  The applicants suggested alternative methods of grading the 1976 Exam and argued that either of these methods "would have been more fair and proper."[48]  The Court held

---

[43] *Id.* at 617.

[44] *Id.*

[45] 378 A.2d at 615–16.

[46] *Id.*

[47] *Id.* at 616.

[48] *Id.*  The alternative methods suggested were "curving" the scores for Essay No. 8 or eliminating the lowest essay score for every applicant who was not eligible to drop their score from Essay No. 8.  The Court held that "[i]t appears that grading Question No. 8 on a curve would have permitted

that the Board "acted carefully and exercised deliberate judgment" after considering several relevant factors, demonstrating that the Board did not act in an arbitrary manner.[49] Further, the Court held that the Board's actions did not produce manifest unfairness because it allowed the applicants to retain their score on Essay No. 8, which increased their odds of passing the exam, and if the Board had done nothing, the applicants would have failed anyway.[50] The Court refused to substitute its judgment for that of the Board and override the Board's method for remedying the clear problems associated with Essay No. 8.

The same principles apply here. The Board tried to reach the fairest possible solution under the circumstances. As reflected in the October 2021 announcement, the Board acted carefully and exercised deliberate judgment after considering several relevant factors, including: the nature of the ExamSoft issues; the number of applicants who experienced ExamSoft issues; the average performance of applicants who experienced ExamSoft issues; and the pattern of the grades for applicants that experienced ExamSoft issues compared to other applicants.[51] Further, the Board enlisted a psychometrician to formulate the best approach that accounted for the

---

more persons to pass the question, having the anomalous result of according more credit to a question properly deemed unreliable." *Id.* at 617. The Court also held that "[t]he petitioners' suggested alternate of excluding the lowest score made by each petitioner in the essay section, suffers from the same fundamental defect [and] . . . petitioners offer no rationale as to how the elimination of low scores on reliable questions can be related to the objective of testing professional competence." *Id.* at 618.

[49] *Id.* at 617.

[50] *Id.*

[51] Opening Br. Ex. E at 1–2.

ExamSoft issues "while maintaining the fairness and integrity of the Delaware Bar Exam for all applicants."[52] The Board was precise and careful in its remedy, addressing a significant issue for applicants that could have undermined the purposes of the Bar Exam—testing for minimal competence. The Board's grading adjustment procedure was not arbitrary or manifestly unfair, and we will not substitute our judgment for that of the Board.

B.

Next, Murphy argues that she was denied the testing accommodations approved by the Board. The ADA prohibits discrimination against individuals with disabilities in all areas of public life. "The purpose of the ADA 'is to place those with disabilities on an equal footing and not to give them an unfair advantage.'"[53] And the ADA's protections extend to applicants taking state bar exams because state bars receive government funding and are considered public entities.[54] As this Court noted in *Rubenstein*,

> It has been observed that the sine qua non for bar examiners' compliance with the ADA "[is] principally a matter of making reasonable accommodations for disabled individuals to take the examination and to communicate with the licensing board." The same authors astutely note that courts are more likely to uphold bar examiners' decisions if they produce an evidentiary record showing

---

[52] *Id.* at 2.
[53] *Petition of Rubenstein*, 637 A.2d 1131, 1137 (Del. 1994).
[54] 42 U.S.C.A. § 12132.

15

that reasonable efforts were made to accommodate a disabled applicant's needs.[55]

The Board Rules echo the requirement of making reasonable accommodations for disabled individuals. Specifically, Board Rule 15(a) regarding testing accommodations for applicants with disabilities states the following:

> The Board will provide accommodations with respect to the manner in which the Bar Examination is administered to applicants who, by virtue of a temporary or permanent disability (as defined under the Americans with Disabilities Act of 1990, as amended), are unable to take the Bar Examination under normal testing conditions, provided that such applicants are otherwise eligible and qualified to take the Bar Examination, and provided that the accommodations are timely requested, reasonable, consistent with the nature of the purpose of the Bar Examination, not unduly burdensome, and necessitated by the applicant's disability. The provisions of this Rule shall apply to the submissions, handling, and appeal of Applications for Testing Accommodations notwithstanding anything to the contrary in the Board Rules.

The Application for Testing Accommodations is submitted to a Board Committee for consideration.[56] If the committee does not grant in full the accommodation sought, the applicant can file a petition for a hearing on the denial of the request no later than ten days after the committee's written decision.[57] The Board then appoints a Hearing Panel to review the committee's decision.[58] The Hearing Panel must

---

[55] *Petition of Rubenstein*, 637 A.2d at 1138 (alteration in original) (first quoting Fedo & Brown, *Accommodating the Disabled Under the ADA: The Issues for Bar Examiners*, The Bar Examiner, Aug. 1992, at 6, 6–7; and then citing *id.* at 8.)
[56] BR 15(c).
[57] BR 15(d).
[58] *Id.*

decide the petition within ten days following the hearing.[59]  If the Applicant is dissatisfied with the Hearing Panel's decision on accommodations, she can file a notice of appeal with the Supreme Court no later than thirty days after the date of the Hearing Panel's decision.[60]  The time frames for deciding requests for accommodations are compressed to allow a final decision and, if necessary, an appeal, before the applicant sits for the Bar Exam.

Murphy makes two ADA arguments.  First, she claims that the Board did not provide her with a paper copy of the exam.  But Murphy did not request a paper copy, and she did not seek review of the Board's ADA decision within the time required by the Board's rules.[61]  Thus, we will not consider this claim.[62]

Second, Murphy challenges the Board's allegedly imperfect execution of her approved accommodations during the Bar Exam.  Because a hearing was not held before the Board, there is no factual record to review her ADA claim.  The Board has also not decided whether Murphy was denied her approved accommodations during Exam administration.  If Murphy intends to pursue a remedy other than waiver of admission requirements following this appeal, the Board should conduct a hearing and determine whether Murphy's approved accommodations were not

---

[59] BR 15(d)(iii).
[60] Supr. Ct. R. 52(e).
[61] BR 15.  In her petition for a hearing before the Board, Murphy conceded that she did not request as an accommodation a paper copy of the Bar Exam.  Opening Br. Ex. C at 4.
[62] Supr. Ct. R. 8; *see Petition of Applicant No. 5*, 658 A.2d at 612 ("To the extent petitioner failed to request that which the Board was willing to grant, his plight is one of his own making.").

provided during administration of the Exam. The determination of the appropriateness of any remedy should occur only following the development of the factual record in the event the Board determines that the ADA accommodations were not provided and executed as approved.

C.

Murphy also argues that the Board improperly denied her a hearing before the Board in violation of the Due Process Clause of the United States Constitution. Murphy claims that by denying her petition for a hearing, the Board "did not develop any evidentiary record on this matter which provides an opportunity for this Court to grant equitable relief *de novo*."[63] She acknowledges, however, that "[t]he Board was likely correct that the relief requested—admission to practice law in the State of Delaware—was outside of their grant of authority from the Court[.]"[64] Thus, a hearing served no purpose. And even if we accept Murphy's claim that she was denied due process, the only remedy available is an order that the Board provide Murphy with a hearing the next time she sits for the Bar Exam and requests accommodations for her disabilities. Because Murphy has not requested a hearing and has not registered for a future Delaware Bar Exam, we cannot grant any relief.

---

[63] Opening Br. at 25.
[64] *Id.*

D.

Finally, Murphy asks that, given the technical difficulties she experienced with the ExamSoft software and the alleged deprivation of her approved ADA accommodations, we waive our admission requirements and allow her to join the Delaware Bar. As noted earlier, our rules state that "[n]o person shall be admitted to the Bar unless the applicant . . . has been examined upon principles of law and equity and has been found by the Board based upon the applicant's performance on such examinations to be qualified to practice as an attorney."[65] And we have said that "neither the Board nor the Court can undertake, as a general function, the granting of bar admissions on waiver of minimum competence standards."[66] Finally, our rules state that we cannot review the Board's actions regarding an individual's grade.[67] We will not waive our admission requirements.

Murphy relies on two cases to argue that the Court can disregard its admission requirements—*Petition of Golby* and *In re Petition of Rubenstein*.[68] In *Golby*, under the rules in effect at the time, Golby had to achieve minimum scores on each of the essay and multi-state portions of the Bar Exam. In July 1976, she passed the essay portion but failed the MBE. As permitted under the rules, Golby re-took only the

---

[65] Supr. Ct. R. 52(a)(7).
[66] *Petition of Applicant No. 5*, 658 A.2d at 612 (quoting *In re Fischer*, 425 A.2d at 603).
[67] Supr. Ct. R. 52(e).
[68] 375 A.2d 1049 (Del. 1977); 637 A.2d 1131 (Del. 1994).

19

MBE portion in February 1977, but once again failed. Between the two exams Golby became seriously ill. As the Court described it, Golby was:

> afflicted with a chronic illness of a serious nature, necessitating a course of radiation therapy and a continuing course of chemotherapy which, together with the symptoms of the illness, caused her great physical distress. The symptoms of the illness and the side effects of the therapies consisted of an almost total loss of vision in the right eye, facial swelling and burns, headaches, chronic pain in the low back and legs, and generalized fatigue. These symptoms and treatment side effects were present during the time that petitioner was required to prepare for the February 23, 1977 multi-state re-examination and significantly detracted from her usual physical and mental capacity.[69]

The Board "took no position" on Golby's petition to suspend Supreme Court Rule 52(a)(6) and admit her to the Delaware Bar.[70] Given the "exceptional circumstances" and "[u]nder the facts and circumstances of this case" the Court granted the petition even though Golby did not pass the MBE portion of the Exam.[71] We have since stated that "*Golby* has no precedential value beyond the very narrow circumstances involved—an applicant nearing the end of a fatal illness who failed the multi-state segment of the bar examination by one point."[72]

In *In re Rubenstein*, Rubenstein passed the essay and multi-state portions of the Bar Exam, but in different sittings.[73] Like the rules in effect when *Golby* sat for the Bar Exam, the Board required passing grades on both the essay and MBE

---

[69] *Petition of Golby*, 375 A.2d at 1049-50.
[70] *Id.*
[71] *Id.* at 1050.
[72] *Petition of Nenno*, 472 A.2d 815, 820 n.6 (Del. 1983).
[73] 637 A.2d at 1132–34.

20

sections.[74] The Court decided that Rubenstein had established her competence to practice law because she had passed both sections, albeit separately, which effectively meant she had passed the entirety of the Bar Exam. The Court waived the requirement that an applicant pass both sections in a single sitting but did not waive the requirement that Rubenstein demonstrate minimum competence to practice law by passing the Bar Exam.[75]

*Golby* and *In re Rubenstein* do not change our view that the Court should not waive its admission requirements. First, in those cases the Court was swayed by the "exceptional circumstances" and "unique and limited circumstances" involved. Those extreme or unusual circumstances are not present here. Second, since the *Rubenstein* decision in 1994, the Court has not deviated from the admission requirements for any reason. Thus, it is fair to say that those decisions have been limited to their facts. And finally, the Bar Exam scoring methodology has changed significantly since *In re Rubenstein*. Those cases were decided when the Bar Exam had separate passing requirements for the essay and MBE sections. Now, the Bar Exam has three parts—the Essays, MPT, and MBE—that are combined to produce a final grade using the following grading methodology:

> An applicant shall be deemed to have passed the Bar Examination if, in a single administration of that Examination, the applicant achieves a "total scale score" of 145.00 or higher. "Total scale scores" are computed as follows: (a) the raw scores on each of the eight essay

---

[74] *Id.* at 1140.
[75] *Id.* at 1139–40.

questions are converted to a score distribution that has a mean of 50 and a standard deviation of 7, (b) the raw scores on each of the two MPT questions are converted to a score distribution that has a mean of 50 and a standard deviation of 14, (c) a given applicant's "total converted score" is the sum of that applicant's converted essay and converted MPT scores, (d) the distribution of the "total converted scores" is scaled to the MBE to yield a "total written scale score," (e) the applicant's "total written scale score" is combined with that applicant's MBE scale score (with the written score weighted at 60% and the MBE score weighted at 40%) to produce a "total scale score." The term "scaled to the MBE" as used herein means that the distribution of "total scale scores" is scaled to a distribution that has the same mean and standard deviation as the MBE scale scores in Delaware.[76]

We cannot separate the Essays, MPT, and MBE scores like in *Golby* and *Rubenstein*. Now, a passing score is based on the entirety of the Bar Exam, not the scores for each section individually.

Finally, we note that *Golby* and *Rubenstein* were decided before our rule amendments in 1999 eliminating our review of individual grades. Prior to 1999, the Board's rules limited the number of times an applicant could take the Bar Exam to three or possibly four attempts.[77] After that, an applicant was forever denied admission to the Delaware Bar. Many of our decisions from this era involved petitions brought by applicants after they failed their final attempt to pass the Bar

---

[76] BR 13.

[77] *See, e.g.*, *In re Fischer*, 425 A.2d at 602–04 (describing the Board's rules in 1979 that limited an applicant to three attempts at passing the Bar Exam, and ultimately recommending that the Board adopt a rule permitting applicants an opportunity to take the Bar Exam a fourth time at the discretion of the Board).

Exam.[78] Relief from this Court was their last opportunity to practice law in Delaware. Recognizing this fact, and not wanting to appear unsympathetic to unique circumstances, we sometimes gave applicants an additional opportunity to take the Bar Exam, or in the exceptional circumstances described above, admission to the Bar.[79]

In 1999, the Board's and the Court's rules were amended to allow applicants unlimited opportunities to take the Bar Exam. At the same time, the rules were amended to prohibit challenges to an applicants' scores once released.[80] Our rules were also amended in 1999 to prohibit review of the Board's decisions on individual grades.[81] With these changes, an applicant who fails the Bar Exam is not completely foreclosed from admission to the Delaware Bar. Since the 1999 amendments, we

---

[78] *E.g.*, *Petition of Cahill*, 677 A.2d 40, 45 (Del. 1996) (applicant failed his third attempt to take the Exam and sought relief from this Court); *In re Murray*, 656 A.2d 1101, 1101–02 (Del. 1995) (same); *In re Fischer*, 425 A.2d at 603 (same).

[79] *Petition of Cahill*, 677 A.2d at 45 (granting Cahill a fourth opportunity to take the Exam); *In re Rubenstein*, 637 A.2d at 1139–40 (granting applicant admission to the Bar after she had did not pass both sections of the Bar Exam in the same sitting three times, and could only take the Exam again if the Board in its discretion granted her the opportunity); *In re Fischer*, 425 A.2d at 604 (granting applicant the opportunity to take the Bar Exam again despite the fact that he failed his third and, at the time, final opportunity to take the Bar Exam).

[80] *Applicant No. 26*, 780 A.2d at 254 ("The [Board Rules] changed in 1999; thereafter, no regrading was permitted."); *see also* BR 16, 29.

[81] Before the rules were amended, our rule stated "[a]ny person aggrieved by an action of the Board may petition the Board for relief within the time period set forth in the rules of the Board or within 15 days after notice of such action of the Board, whichever is longer." Supr. Ct. R. 52(f) (Apr. 1, 1998). This rule, which did not prohibit review of individual grades, was amended on November 19, 1999, to state: "Any person aggrieved by [sic] final action of the Board may appeal to the Court for relief if such action affects the substantial rights of the person claimed to be aggrieved, except that decisions of the Board with respect to a specific grade or grades assigned to any individual applicant are final and shall not be subject to review by the Court." Supr. Ct. R. 52(f) (Nov. 19, 1999). This amended language is substantially the same as the current Supreme Court Rule 52(e).

have refused to review any applicant's score or grant an applicant admission to the Bar for any reason.[82]

Murphy did not achieve a passing score on the Bar Exam—a requirement for admission. The remedy for improper Board conduct in administering the Bar Exam—whether that be arbitrary and manifestly unfair procedures, an ADA violation, or a constitutional deficiency—is the opportunity to re-take the Bar Exam free of any infirmities in the Board's prior administration of the Bar Exam.[83] We will not waive our rules for admission to the Delaware Bar.

## III.

Neither the Board nor this Court will waive the admission requirements for the Delaware Bar. If, however, Murphy intends to pursue some other remedy for

---

[82] *E.g.*, *Applicant No. 009 to 2002 Del. Bar Examination v. Bd. of Bar Exam'rs of Del. Supr. Ct.*, 2003 WL 22416043, at *1 (Del. Oct. 20, 2003) (denying applicant's appeal of the Board's refusal to re-grade his grade on a specific essay under our rule prohibiting review of individual grades and stating that "[m]oreover, the applicant has the right to apply to sit for the bar examination again."); *In re Kennedy*, 2003 WL 1987984, at *1 (Del. Apr. 28, 2003) (denying applicant's appeal of the Board's refusal of her request to review her Exam answers, and stating that "we continue to find no violation of procedural or substantive due process in the manner in which the Delaware Bar Examination is graded and reviewed."); *Applicant No. 26*, 780 A.2d at 253–54 (denying applicant's constitutional claims on her appeal of the Board's refusal to re-grade her exam, and stating that "[h]er rights are fully protected by the opportunity to the [sic] take the Bar Examination again.").

[83] *See Petition of Cahill*, 677 A.2d at 45 (finding the Board erred when it denied applicant's request for accommodations without a hearing, but stating that "[t]he appropriate and equitable remedy is for this Court" to allow Cahill to take the bar exam again); *see also Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1160–67 (9th Cir. 2011) (finding denial of accommodations was likely a violation of the ADA, and granting preliminary injunction requiring the NCBE to permit the applicant to take the exam again with the requested accommodations); *In re Murray*, 656 A.2d at 1104 (denying the applicant's requested relief—admission to the bar despite failing the exam—but stating that retaking the exam "might or might not have been available to him upon demonstration of 'good cause' under the [Board's rules].").

her ADA claim following appeal, the Board should conduct a hearing and determine whether Murphy's approved accommodations were not provided during administration of the Exam. The determination of the appropriateness of any remedy should occur only following the development of the factual record in the event the Board determines that the ADA accommodations were not provided and executed as approved. We therefore remand to the Board for further proceedings, if necessary, consistent with this opinion. Within 30 days of the issuance of the mandate, Murphy shall notify the Board whether she intends to pursue a hearing before the Board on her ADA claims.